UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ROTHROCK & ASSOCIATES FINANCIAL, INC.,
d/b/a ROTHROCK & ASSOCIATES

**05 5701**

Civil Action No.

Plaintiff,

-against-

GERSHON **COMPLAINT**
(Plaintiff Demands Trial by Jury)

JORDAN DREW, DAVID MARCUS, ALL
QUOTES INSURANCE, INC. and CYBER
FINANCIAL NETWORK, INC.,

POHORELSKY, M.J.

Defendants.
-------------------------------------------------------------X

Plaintiff, Rothrock & Associates Financial, Inc. d/b/a Rothrock & Associates

("Rothrock"), by its attorneys, Rottenberg Lipman Rich, P.C., as and for its complaint against

defendants, Jordan Drew ("Jordan"), David Marcus ("Marcus"), All Quotes Insurance, Inc. ("All

Quotes"), and Cyber Financial Network ("CFN" and collectively "Defendants"), alleges as

follows:

### NATURE OF ACTION

1.     This is an action for specific performance, breach of contract, fraud, unjust

enrichment, and declaratory judgment, arising from Defendants' purposeful and fraudulent

diversion of insurance business leads from Rothrock – a West Palm Beach, Florida insurance

agency to which defendants All Quotes is contractually obligated to forward such leads – to

other insurance brokers, and the near destruction of Rothrock as a business.

2.     On account of Defendants' actions, which appear to be part of a

widespread scheme to defraud insurance agents and mortgage brokers across the country,

Rothrock's business has suffered severe damages and layoffs, and in fact stands to be wiped out

altogether, while Defendants reap revenues in the tens of millions of dollars from their unlawful re-selling of exclusively promised consumer lead information to multiple parties.

       3.     When counsel for Rothrock wrote to All Quotes and defendant CFN in early November 2005 to complain about the diversion of leads and demand that the problem be rectified, defendant Drew telephoned counsel and represented that the diversion of insurance business leads was due to a "computer glitch."

       4.     Drew's statement was manifestly false and intentionally misleading.

       5.     As Rothrock already suspected and soon verified, two other insurance agents in the West Palm Beach vicinity had already entered into contracts with All Quotes pursuant to which they agreed to receive and pay for, and in fact have received and paid for, insurance leads that All Quotes was and is unambiguously obligated to forward exclusively to Rothrock.

       6.     In fact, on December 5, 2005, another Florida-based insurance agent, at the request of Rothrock, contacted All Quotes to inquire about purchasing insurance leads and was promptly forwarded a contract that tramples on Rothrock's rights.

## JURISDICTION AND VENUE

       7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, by virtue of diversity of citizenship between Rothrock and all of the Defendants, and the amount in controversy exceeding the sum of $75,000, exclusive of interest and costs.

       8.     Venue lies in this Court pursuant to 28 U.S.C. §1391(a) since all of the Defendants reside in this District.

## PARTIES

9.      Rothrock is a corporation organized and existing under the laws of the State of Florida, and is an insurance agency duly licensed as such and is located in West Palm Beach County of that State.

10.     Defendant Cyber Financial Network, Inc. ("CFN") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 1660 Walt Whitman Road, Melville, New York.

11.     Defendant All Quotes Insurance, Inc. ("All Quotes") is a corporation organized in December 2001 and existing under the laws of the State of Delaware with its principal place of business located at 1660 Walt Whitman Road, Melville, New York.  Upon information and belief, All Quotes Insurance, Inc. is a wholly owned subsidiary of CFN, or shares the same ownership as CFN, and is operated by personnel, including defendant Drew, who are employed by CFN.

12.     Defendant Drew upon information and belief resides in the State of New York and is an officer and/or director and/or key employee or consultant of CFN and All Quotes.

13.     Defendant David Marcus ("Marcus") upon information and belief resides in the State of New York and is the president and CEO of CFN, with managerial responsibilities for All Quotes as well.

## FACTS

### A.     Rothrock's Business

14.     Rothrock was founded in the fall of 2003 by Virginia Rothrock, who is currently Rothrock's General Manager and Vice President, for the purpose of selling homeowner's and other types of insurance to consumers in Florida.

15.     Since its inception, Rothrock has concentrated its sales efforts towards purchasers of new homes in Palm Beach, Broward, Miami-Dade and other counties in Florida.

16.     From its inception through November-December 2004, Rothrock enjoyed stunning success, due in large part to its contracts with CFN and All Quotes.

17.     Thus, from September 2003 to January 2005, Rothrock grew from two to six employees, and its revenues increased steadily.

18.     Due to the dramatic decrease in insurance leads received from All Quotes starting in or around December 2004, however, Rothrock has halved in size to three employees, all of whose livelihoods also are now threatened.

**B.      CFN and All Quotes**
         **under Drew and Marcus**

19.     CFN is a media company that specializes in creating, managing and maintaining consumer websites focused on various segments of the financial services industry, including mortgage lending, insurance and auto financing.

20.     CFN attracts visitors to its websites through various on-line advertising and marketing campaigns with all of the major search engines, including AOL, Microsoft, Google, and Yahoo.

21.     CFN was founded in September 2000 by Drew and Marcus to purchase the assets of Cyber Media Group, Inc., a corporation founded by Drew in 1998.

22.     One of the assets CFN thereby purchased, and upon information and belief still maintains, is the website www://allquotesinsurance.com (the "All Quotes Website"), whose purpose is to connect consumers with insurance agents.

23.     The value of the All Quotes Website to insurance agents, and the chief reason behind CFN's annual revenues spiking towards $50 million for 2005, is that the site is

- 4 -

enormously popular. As of the date of this complaint, if one searches for "homeowner's insurance" using Google.com, for example, the All Quotes Website is the second highlighted hit. As of May 2003, CFN had received a top five ranking among similar websites by respected internet watcher com.Score, a leader in the forecasting of e-commerce trends.

24.    Along these lines, CFN's corporate website, www.cyberfinancialnetwork.com, touts:

> Year after year, CFN's properties [i.e., its websites] maintain their position among the top online destinations, as measured by industry analysts such as Nielsen//NetRatings and comScore Media Metrix. These popular websites are also leading resources for industry professionals because of their extensive reach and advanced database management capabilities.

25.    CFN's website also states that the All Quotes Website provides "financial services professionals" with "state-of-the-art marketing tools that achieve measurable results" and "an ever-expanding pool of sophisticated, pre-qualified consumers." CFN's marketing material continues:

> The AllQuotesInsurance.com Strategic Partner Program offers a seamless solution that will enable you to seize control of your target markets and immediately increase your presence, both online and offline. When you join our network, a skilled Internet Consultant will work with you to identify your most profitable target areas. Then, we'll begin connecting you with active, in-market consumers. It's that simple.

26.    Insurance agents thus willingly part with multiple thousands of dollars for the right to receive referrals, i.e., leads to consumers matching the insurance agent's business criteria, which the website generates as a result of the consumer keying his or her personal data into the All Quotes Website.

27.    Drew and Marcus have shared responsibility for managing CFN and All Quotes, with Marcus focusing on the financial aspects of the business and Drew concentrating on

sales growth by managing and motivating sales representatives and refining and enhancing the companies' products lines, including the All Quotes Website.

28.     Drew, who has previous experience in the telemarketing field as a principal with Falcon Crest Communications and in the area of investor relations and raising money for Cyberweb Café, Inc., is also primarily responsible for CFN's and All Quotes' marketing strategies and contracting policies and practices.

29.     In this regard, Drew's efforts are aimed at, among other things, devising marketing strategies to increase the number of CFN's clients, such as Rothrock, who pay for the right to receive consumer leads generated by the All Quotes Website and several other websites run by CFN.

30.     In such capacity, upon information and belief, Drew is the primary person at CFN and All Quotes responsible for the scheme to defraud Rothrock of its rights and business potential, as alleged herein.

31.     In 2003, CFN had 1200 clients and projected annual revenues of $25-30 million.  Upon information and belief, those numbers are significantly higher for 2005.

32.     Drew and Marcus know that many of their clients rely on CFN and its affiliated websites for 80-90% of their business.

33.     Based upon discussions between Rothrock and representatives of CFN and All Quotes, Defendants have known, or should have known, that Rothrock is such a client.

C.     **The Zip Code Lock In Agreements**

34.     In September 2003, based on marketing efforts by CFN and conversations with CFN salespersons, Rothrock decided to enter into an agreement with CFN.  CFN then sent

Rothrock a form contract prepared by CFN entitled "ZIP CODE LOCK IN AGREEMENT," which Rothrock executed and sent back to CFN (the "September 15, 2003 Agreement").

      35.   Pursuant to the September 15, 2003 Agreement, CFN agreed, among other things, in exchange for Rothrock's payment of $5,000 (which was duly made), and other consideration:

- to refer to Rothrock for a one-year period, via email or other means, all data submitted by consumers to the All Quotes Website from ten specified zip codes with respect to homeowner's, automotive and small business insurance.

- "not to deliver, sell or transfer information derived from consumers residing within the zip code(s) subscribed to be Client to anyone other than Client as outlined in [the September 15, 2003 Agreement]" (emphasis added).

- "to renew [the September 15, 2003 Agreement] with respect to the above referenced zip code(s) and categories, for so long as Client pays all of the required cost under this Agreement, abides by the terms of this Agreement, and confirms that an extension of this Agreement is requested.

      36.   At that time and now, Rothrock was and is interested in selling only homeowner's insurance. At all relevant times, Rothrock could not sell "small business" (or commercial) insurance and was not interested in selling automotive insurance. When Rothrock discussed the fact that the September 15, 2003 Agreement was therefore over-inclusive, as it included homeowner's as well as automotive and small business (and later, "renters") insurance,

a CFN representative told Rothrock that the contract they could provide had to contain all three
(and later, four) categories as a package.

37.     In any event, during the subsequent two years, Rothrock renewed the
September 15, 2003 Agreement, and entered into other "ZIP CODE LOCK IN AGREEMENTS"
with terms substantively identical to those of the September 15, 2003 Agreement, as amended
(collectively, the "Zip Code Lock In Agreements").

38.     Consequently, as of December 2005, Rothrock had purchased the
exclusive right to receive consumer leads from the All Quotes Website relating to homeowner's,
automotive, small business and renters insurance with respect to the following zip codes
("Rothrock's Zip Codes"):

| | | | | |
|---|---|---|---|---|
| 33029 | 33073 | 34953 | 34109 | 34987 |
| 33067 | 33077 | 34990 | 34238 | 33411 |
| 33071 | 33313 | 32789 | 33076 | 33414 |
| 33325 | 33319 | 33134 | 33410 | 33433 |
| 33326 | 33323 | 33327 | 33418 | 33436 |
| 33331 | 33329 | 33434 | 33458 | 33437 |
| 33065 | 33467 | 33629 | 33496 | 34986 |
| | | | 33498 | 33466 |

**D.    Rothrock's Business Suffers a
        Steep Downturn**

39.     Upon information and belief, in or around December 2004, or most likely
earlier, defendants embarked on a scheme to defraud Rothrock (and other clients of CFN and All
Quotes with exclusive zip code referral rights), by marketing and selling to third parties the very
consumer information that AllQuotes had agreed to forward to Rothrock (and others) on an
exclusive basis.

40.     In or around December 2004, Rothrock began noticing a drop-off in the
number and quality of leads it was receiving from new home buyers in West Palm Beach,

Broward and other preferred zip codes that Rothrock had purchased zip codes from Defendants pursuant to the Zip Code Lock In Agreements or previous versions thereof.

41.     At or around that time, Virginia Rothrock telephoned Sean McAuliffe, CFN's sales representative assigned to Rothrock, but he could not or would not explain or solve the problem.

42.     Instead, he convinced Ms. Rothrock to purchase more exclusive rights in other zip code areas, so that in December 2004, Rothrock increased its exclusive coverage with All Quotes from 11 zip codes to 29.

43.     Shockingly, despite increasing the coverage of its exclusive Zip Code Lock In Agreements, Rothrock found that the quality and quantity of the leads it was receiving deteriorated throughout the first quarter of 2005.

44.     As Ms. Rothrock grew increasingly apprehensive, McAuliffe continued to deny that anything was amiss and pushed more and more zip codes on Rothrock.

45.     By June 2005, however, despite tripling the number of zip codes Rothrock "owned," the number of leads that the All Quotes Website generated for Rothrock began to decrease dramatically, as depicted in the following chart:

| Month | Total Leads from Rothrock Zip Codes | Total Leads Referred (includes default leads, i.e., lead from non-Rothrock Zip Codes) |
|---|---|---|
| August 2004 | 127 | 271 |
| September 2004 | 93 | 172 |
| October 2004 | 63 | 108 |
| November 2004 | 70 | 132 |
| December 2004 | 70 | 144 |
| January 2005* | 121 | 256 |
| February 2005 | 129 | 291 |
| March 2005 | 146 | 330 |
| April 2005 | 114 | 261 |
| May 2005 | 150 | 359 |
| June 2005 | 88 | 256 |
| July 2005 | 76 | 301 |
| August 2005 | 64 | 417 |
| September 2005 | 37 | 314 |
| October 2005 | 17 | 157 |

* Rothrock purchased 18 new zip code areas in December 2004.

46.    During the same period, despite All Quote's knowledge that Rothrock could not sell commercial insurance, the percentage of commercial insurance leads that All Quotes referred to Rothrock increased from approximately 10% to 50% of total leads.

47.    Having grown to a six-employee business as of January 2005, Rothrock's business downturn during the first quarter of 2005 necessitated the departure of Rothrock's General Manager, in March 2005, and two agents, in April and September 2005, respectively.

48.    At all relevant times, Rothrock made no changes to its business practices, or otherwise, that would have or could have caused the decrease in leads.

49.    Moreover, throughout the terms of the Zip Code Lock In Agreements, Rothrock always paid CFN and All Quotes in full as required by such agreements, and otherwise abided by the terms of such Agreements.

E.    **Rothrock Uncovers Defendants'**
      **Scheme, Despite Defendants'**
      **Efforts to Conceal It**

50.    By October 2005, given the seriousness of its business downturn, and the

run around from CFN and All Quotes, Ms. Rothrock and others at Rothrock were becoming

increasingly apprehensive, and suspicious that CFN and All Quotes were giving other insurance

agents Rothrock's leads.

51.    Ms. Rothrock thus queried the AllQuotes Website as a consumer,

requesting homeowner's insurance information with respect to property within one of Rothrock's

Zip Codes.

52.    The All Quotes Website referred her to another agent.

53.    Over the next month or so, a large percentage of similar queries by Ms.

Rothrock and Rothrock personnel generally produced referrals to agents other than Rockrock.

54.    The inescapable conclusion was that All Quotes was intentionally and

routinely diverting and selling to other insurance agencies leads that should have been going to

Rothrock.

55.    In early November 2005, Rothrock engaged the undersigned counsel,

Rottenberg Lipman Rich, P.C. ("RLR"), to investigate and, if necessary, to commence legal

action to protect and preserve Rothrock's rights.

56.    By letter dated November 8, 2005, sent via FedEx, a copy of which is

annexed as Exhibit B, Harry W. Lipman, Esq. of RLR ("Lipman") wrote to CFN and All Quotes

accusing them of violating Rothrock's exclusive rights and demanding, among other things, that

All Quotes abide by the applicable Zip Code Lock In Agreements:

> We therefore hereby demand that, in accordance with the various
> contracts between Rothrock and All Quotes, All Quotes
> immediately restore Rothrock as the sole and exclusive referral

> agent for, as appropriate, home owners, automotive, small business
> and renters insurance for [Rothrock's Zip Codes]
>
> Upon receipt of this letter, please immediately have someone from
> All Quotes with responsibility for customer account maintenance
> contact us by telephone to assure us that this situation has been
> permanently corrected.

57.     RLR's November 8, 2005 letter demanded a response by November 14,

2005.

58.     On November 14, 2005, Drew telephoned Lipman and assured him that

the severe lull in lead referrals to Rothrock from the All Quotes Website over the past several

months was due to a "computer glitch" and that the problem had been corrected.  Drew further

offered to extend each of Zip Code Lock In Agreements two months to compensate for All

Quote's error.

59.     By letter dated November 15, 2005, sent by telecopier and certified mail,

return receipt requested, Lipman wrote to Drew to confirm the substance of that conversation

and to accept his offer to extend the Zip Code Lock In Agreements two months.

60.     Lipman's November 15, 2005 letter also sought to "confirm that Rothrock

is the sole and exclusive referral agent for, as appropriate, home owners, automotive, small

business and renters insurance, on your allquotesinsurance.com website for" Rothrock's Zip

Codes, and

> ... further to confirm that that All Quotes Insurance, Inc., Cyber
> Financial Network, Inc. or any of their affiliates has not contracted
> or made any other arrangements with any of the agencies listed
> below with regard to lead referral for home owners, automotive,
> small business and renters insurance on the allquotesinsurance.com
> for any of [Rothrock's Zip Codes]:
>
> - The Wigglesworth-Rindom Insurance Agency of Delray Beach, FL
> - L.J. Ross Insurance Services Inc. of Coral Springs, FL
> - Allstar Direct Insurance & Financial Svcs. of North Miami, FL

- Killingsworth – Allstate Agency of Lakeland, FL
- Insurance Professionals of Miami, FL
- Van Eerden Insurance Agency/Allstate of Parrish, FL
- Ted Todd Insurance Agency, Inc. of Bonita Springs, FL

61.    Lipman also requested Drew to "notify us immediately in writing if any of the above is inaccurate or untrue in any respect."

62.    RLR has not heard back from Drew to date.

63.    Neither CFN nor All Quotes has increased the term of Rothrock's Zip Code Lock In Agreements by two months, as Drew had promised.

64.    Drew's statement that the decrease in the number of lead referrals transmitted to Rothrock has been caused by a "computer glitch" was manifestly false and misleading, and was made knowingly or with reckless disregard for the truth.

65.    Since mid-November 2005, Ms. Rothrock and others have verified that Defendants have deceived Rothrock, and that All Quotes has been blatantly breaching Rothrock's rights under the Zip Code Lock In Agreements.

66.    Ms. Rothrock personally telephoned two Florida insurance agencies – L.J. Ross Insurance Services Inc. of Coral Springs ("L.J. Ross") and The Wigglesworth-Rindom Insurance Agency of Delray Beach ("Wigglesworth-Rindom") – which appeared to be the principal recipients of insurance leads from the All Quotes Website that should have been given to Rothrock.

67.    On December 1, 2005, Ms. Rothrock spoke with Larry Ross of L.J. Ross. Although Mr. Ross would not give Ms. Rothrock a copy of his agreement with All Quotes, he stated that L.J. Ross had had a contract in place with All Quotes for over a year, encompassing the entirety of Broward County (the "Ross Agreement").

- 13 -

68.     Under the Ross Agreement, according to Mr. Ross, his company pays a fee on a per-lead basis for referrals generated by the All Quotes Website and forwarded to him. Also part of the Ross Agreement is a quota concept, pursuant to which he was initially obligated to accept and pay for some 300 leads per month, which he has since reduced to 100 per month because L.J. Ross could not handle the volume.

69.     On December 1, 2005, Ms. Rothrock met with Mike Rindom, of the Wigglesworth-Rindom Insurance Agency.  Mr. Rindom showed her his contract with All Quotes (the "Rindom Agreement") and actually let her have a partial copy of it.  (Concerned with retaliation against him by All Quotes, Mr. Rindom did not agree to give Ms. Rothrock a copy of the face page of the agreement, which among other things identifies his company.)

70.     On page two of the Rindom Agreement, the second "Whereas" clause identifies Mike Rindom of Wiglesworth-Rindom [sic] Insurance Agency as "desir[ing] to employ the services of Company [All Quotes Insurance, Inc.] to make available to Client certain data obtained from consumers via the [All Quotes] Website on the terms and conditions described in the [Rindom] Agreement."

71.     Under the Rindom Agreement, the first page of which shows that it pertains to all zip codes beginning with 334 (i.e., the entirety of Palm Beach County, encompassing all of Rothrock's Zip Codes in that county), All Quotes agrees not to "deliver, sell or transfer information derived from consumers residing within the zip code(s) subscribed to by Client to anyone other than the Client and up to three (3) additional client in our network."

72.     In exchange for such leads, Rindom agrees to pay a monthly maintenance fee as well as a per-lead fee to All Quotes.

- 14 -

73.    Both the Ross Agreement and the Rindom Agreement enable the client to target more desirable areas and allow them to purchase homeowner's insurance only, unlike the package deal that CFN and All Quotes forced on Rothrock.

74.    To obtain further and conclusive documentary proof of Defendants' culpability, Ms. Rothrock asked her friend Robert Gorman, a Florida-based insurance broker, to contact All Quotes and inquire about obtaining insurance leads from Palm Beach and St. Lucie County.

75.    Mr. Gorman called All Quotes and promptly received a contract entitled "DATA DISTRIBUTION AGREEMENT," with a start date of December 5, 2005.

76.    The Proposed Gorman Agreement provides that All Quotes will forward up to 150 referrals to Gorman per month in exchange for Gorman's payment of a monthly maintenance fee of $50 and a $10-per-lead fee for homeowner's insurance referrals.

77.    The Proposed Gorman Agreement pertains to consumer referrals from all zip codes beginning with 334 and 349, in blatant violation of Rothrock's rights.

78.    Not surprisingly, Rothrock's lead-referral downturn has continued to date, as have Defendants' fraudulent efforts to conceal their wrongdoing. Defendants' latest feint has been to send Rothrock an increased number of "default leads," that is, leads from non-Rothrock Zip Codes in the same general geographical vicinity. These default leads are almost always useless.

## FIRST CLAIM FOR RELIEF
### (Specific Performance, against All Quotes)

79.    Rothrock repeats and realleges all the foregoing allegations as if fully set forth herein.

- 15 -

80. The Zip Code Lock In Agreements are valid and enforceable under New York law.

81. Rothrock has substantially performed all its duties and obligations under the Zip Code Lock In Agreements and is willing and able to perform its remaining obligations thereunder.

82. All Quotes is able to perform its all its duties and obligations under the Zip Code Lock In Agreements.

83. Rothrock has no adequate remedy at law, since, among other reasons, failure by All Quotes to perform its duties under the Zip Code Lock In Agreements would mean the further demise and destruction of Rothrock's business.

84. In view of the foregoing, Rothrock is entitled to an order compelling All Quotes specifically to perform its duties and obligations under the Zip Code Lock In Agreements.

## SECOND CLAIM FOR RELIEF
### (Fraud, against all defendants)

85. Rothrock repeats and realleges all the foregoing allegations as if fully set forth herein.

86. Since December 2004, and most likely before, Defendants have engaged in a plan and scheme to obstruct, and/or divert to other insurance agents, referrals of consumer leads from the All Quotes Website that should have gone to Rothrock.

87. In furtherance of that scheme, Defendants have caused All Quotes to negotiate and enter into the Rindom Agreement, the Ross Agreement, and upon information and belief other agreements that breach and destroy Rothrock's valuable rights under the Zip Code Lock In Agreements, making them essentially worthless.

- 16 -

88.     On numerous occasions from December 2004 through November 2005, Rothrock and others acting on its behalf have inquired into and demanded to know the true circumstances behind Rothrock's drastic decrease in consumer leads from the All Quotes Web Site.

89.     On each and every such occasion Defendants and their agents and representatives have fraudulently denied and concealed Defendants' scheme and plan to profit at Rothrock's expense.

90.     Since at least December 2004, moreover, Defendants have purposefully manipulated the lead generation attributes of All Quotes to increase the numbers of certain kinds of leads forwarded to Rothrock for the purpose of deceiving Rothrock into believing that All Quotes was not forwarding Rothrock's leads to other agents.

91.     On November 14, 2005, defendant Drew, in receipt of RLR's letter demanding that All Quotes and CFN perform their obligations under the Zip Code Lock In Agreements, telephoned counsel for Rothrock and falsely attributed the decrease in Rothrock's leads to a "computer glitch."

92.     Upon information and belief, a computer error at CFN or All Quotes did not cause the plunge in Rothrock's leads.

93.     Drew's statement and defendants' numerous other representations to Rothrock were in fact false and misleading, and done knowingly or with reckless disregard for the truth.

94.     In reasonable and justifiable reliance on Defendants' statements and material misrepresentations, Rothrock entered into the Zip Code Lock In Agreements, hired

- 17 -

employees, and made other business decisions based on the legitimate expectancy of obtaining the consumer leads for many years to come.

95.    Had Rothrock known of Defendants' true intentions not to honor their contracts, promises, guarantees, representations and commitments, Rothrock would not have taken the actions it did.

96.    As a direct and proximate result of Defendants' misconduct, fraud, deceit, and misrepresentations, plaintiff Rothrock sustained damages in an amount to be determined at trial, but believed to be not less than One Million Dollars ($1,000,000), including, but not limited to, loss of business revenue, loss of customer and client base, loss of the price paid to Defendants for zip codes, loss of profits, and other consequential and incidental damages reasonably foreseeable by Defendants that would be suffered by Rothrock as a result of Defendants' fraud.

97.    Defendants' actions were intentional, willful, and malicious, and have been directed at others in the public at large, entitling plaintiff to exemplary and punitive damages in an amount of not less than Fifteen Million Dollars ($15,000,000).

### THIRD CLAIM FOR RELIEF
### (Breach of Contract and the Covenant of Good Faith and Fair Dealing, against All Quotes)

98.    Rothrock repeats and realleges all the foregoing allegations as if fully set forth herein.

99.    Under the Zip Code Lock In Agreements, Rothrock has valuable contractual rights.

100.    At all relevant times, Rothrock has fully performed its duties and obligations under the Zip Code Lock In Agreements.

101.    By its actions, as aforesaid, All Quotes has breached the Zip Code Lock In Agreements, and the covenant of good faith and fair dealing under New York law, causing

- 18 -

Rothrock damages and consequential damages in an amount in excess of $1,000,000, to be more precisely determined at trial.

### FOURTH CLAIM FOR RELIEF
### (Unjust Enrichment, against All Quotes and CFN)

102.   Rothrock repeats and realleges all the foregoing allegations as if fully set forth herein.

103.   As set forth above in detail, All Quotes and CFN have entered into contracts with other insurance agencies and agents in blatant violation of Rothrock's rights under the Zip Code Lock In Agreements.

104.   In addition, All Quotes and CFN have actively and furtively sought to conceal such activities and their blatant and fraudulent disregard for Rothrock's rights.

105.   Meanwhile, All Quotes and CFN have collected substantial revenues as a result of their contracts with other insurance agencies and agents, in an amount currently unknown to Rothrock but estimated to be in excess of $200,000.

106.   Under the circumstances, it would be unjust and inequitable for All Quotes and/or CFN to retain such revenues.

107.   As a result of the foregoing, All Quotes and/or CFN have been unjustly enriched, and Rothrock should be compensated, in the amount not less than $200,000, to be more precisely determined at trial.

### FIFTH CLAIM FOR RELIEF
### (Declaratory Judgment, pursuant to 28 U.S.C. § 2201, against All Quotes)

108.   Rothrock repeats and realleges all the foregoing allegations as if fully set forth herein.

- 19 -

109.    The Zip Code Lock In Agreements provide that, in exchange for payment by Rothrock of certain enumerated fees, All Quotes shall deliver, and Rothrock shall receive on an exclusive basis, all information derived from consumers residing within the specified zip codes for the specified categories of insurance.

110.    Under each of the Zip Code Lock In Agreements, All Quotes agrees "to grant to [Rothrock] the right of first refusal to renew this Agreement with respect to the zip code(s) and category(ies) contained" in each of those Agreements.

111.    Nonetheless, based upon comments made to Rothrock's counsel by defendant Drew, Rothrock understands All Quote's position to be that, under the Zip Code Lock In Agreements, All Quotes may cancel any such Agreement at any time for any reason, with the sole consequence being that All Quotes would have to refund to Rothrock the pro-rata portion of any monies paid by Rothrock under the Zip Code Lock In Agreements.

112.    In view of the foregoing, particularly Defendants' anticipated repudiation of the Zip Code Lock In Agreements, there currently exists an actual controversy between the parties that is capable of judicial resolution.

113.    Rothrock therefore seeks a declaration pursuant to 28 U.S.C. § 2201 that All Quotes must honor Rothrock's right of first refusal under the Zip Code Lock In Agreements.

WHEREFORE, Rothrock demands judgment as follows:

(a)    On the First Claim for Relief, directing All Quotes specifically to perform the Zip Code Lock In Agreements;

(b)    On the Second Claim for Relief, against all Defendants in the sum of One Million Dollars ($1,000,000) and punitive and exemplary damages in the sum of Fifteen Million Dollars ($15,000,000);

(c)     On the Third Claim for Relief, against All Quotes, in the sum of One

Million Dollars ($1,000,000);

(d)     On the Fourth Claim for Relief, against All Quotes and CFN, in the sum of

Two Hundred Ten Thousand Dollars ($210,000);

(e)     On the Fifth Claim for Relief, against All Quotes, for a declaration

pursuant to 28 U.S.C. § 2201 that All Quotes must honor Rothrock's right of first refusal under

the Zip Code Lock In Agreements;

(f)     Pre- and post-judgment interest;

(g)     Costs and disbursements of this action; and

(h)     Such other and further relief as the Court deems just and proper.

Dated:     New York, New York
           December 7, 2005

ROTTENBERG LIPMAN RICH, P.C.


By: _____
      Harry W. Lipman (HL-4207)
      Thomas E. Chase (TC-8266)
      369 Lexington Avenue, 15th Floor
      New York, New York  10017
      (212) 661-3080

Attorneys for Plaintiff, Rothrock & Associates
Financial, Inc. d/b/a Rothrock & Associates